263 F.Supp.2d 1212 (2003)
Joanne S. WILSON, Plaintiff,
v.
HOMEOWNERS LOAN CORP. and Meritech Mortgage Services, Defendants.
No. 02-CV-151CDP.
United States District Court, E.D. Missouri, Eastern Division.
March 17, 2003.
*1213 JoAnne S. Wilson, St. Louis, MO, pro se.
Erik L. Hansell, James J. Simeri, Matthew T. Schelp, Husch and Eppenberger, LLC, St. Louis, MO, for Homeowners Loan Corp.
Charles S. Pullium, Millsap and Singer, St. Louis, MO, for Meritech Mortgage Services.

MEMORANDUM AND ORDER
PERRY, District Judge.
This matter is before the Court following a bench trial. There are also a number of motions pending that were filed after trial. Based on the evidence and arguments presented, I find that plaintiff has failed to prove that defendants violated the Truth in Lending Act, and I will therefore dismiss her complaint and enter judgment for defendants.

Findings of Fact
Plaintiff JoAnne Wilson owned the home at 14908 Appalachian Trial, St. Louis. Wilson is a licensed attorney, but was not working as a lawyer at the time of the events leading up to this dispute. In late 2000 or early 2001 she received a solicitation in the mail regarding loan opportunities *1214 from defendant Homeowners Loan Corporation.
Plaintiff contacted Homeowners and inquired about taking out a home equity loan. Harold Williams, with whom she spoke, told her that Homeowner's had a program for self-employed people who could not prove a regular monthly income. Although Wilson had sought to borrow $50,000 as a home equity loan, Williams told her that Homeowners would consider refinancing her entire home, which would allow her to take out additional cash, rather than doing a separate home equity loan. She began telephone discussions with Homeowners and eventually it agreed to lend her $126,750.00. Under the terms, her existing loan would be paid off, another consumer debt would be paid off, and Wilson would obtain $28,000 in cash.
On February 3, 2001, Homeowners sent a notary to Wilson's home, and at that time plaintiff signed both the application for the loan and all the loan closing papers. Before that date nothing had been provided to Wilson in writing, nor had she sent anything to Homeowner's in writing. All the discussions up to this point had been over the telephone. Among the paperwork that the Homeowner's agent provided to Wilson was a Truth In Lending Act notice, which indicated that she had until midnight on February 7, 2001, in which to rescind or cancel the loan.
At some point in time before February 7, Wilson contacted her existing lender, Countrywide/Full Spectrum, and inquired whether it would be willing to refinance her home on terms more favorable to her than Homeowner's had agreed to. Plaintiff sent Countrywide copies of the documents she had signed for Homeowners, and told them she had to know whether they could do the deal before her rescission period expired at midnight on February 7.
Countrywide did agree to refinance, on terms that were better than those provided by Homeowners, and Theresa Simmons of Countrywide notified Wilson of this decision around 9 or 9:30 p.m. on February 7. Wilson testified that as soon as she got this message, she picked up the notice of rescission form and her purse and drove to the airport post office. This office was, at that time, open till 11 or 11:30 p.m. It was located more than fifteen miles from Wilson's home, so driving there took twenty to thirty minutes. In any event, Wilson says that when she arrived at the post office she discovered that her wallet was not in her purse, and she had left it at home. She found some change in her purse, but did not have enough money to send the notice by certified mail. The postal worker on duty suggested she use a "Certificate of Mailing," which costs less than certified mail, because that was better than no evidence at all of her mailing. She did so, and made a copy of the notice of rescission and the certificate of mailing. The certificate of mailing shows that she mailed something to Homeowners from the airport post office on February 7, 2001.
On February 8, 2001, Homeowners funded the loan, and wire transferred $28,000 to plaintiffs bank account. Homeowners witnesses testified that it has no record of receiving anything from plaintiff on February 8, nor does it have any record of ever receiving a notice of rescission.
It is undisputed that Wilson hadat some point in timenotified the Homeowner's agent with whom she had been dealing, Harold Williams, that she was considering obtaining financing from Countrywide. Williams says this conversation took place before February 3, and so he did not think it had anything to do with a potential rescission of the contract that had already been signed. Plaintiff says that this conversation took place after *1215 the contract was signed and before the rescission, and that Homeowners thus was on notice that she was considering rescinding. It is also undisputed that on February 7, at 5:16 p.m., plaintiff faxed a voided check to Homeowners, which it needed in order to disburse the funds to her account on February 8. Williams says this was done because plaintiff called some time that day and wanted to be sure that the money was wired to her account as soon as possible on the 8th. Wilson says this was done because Williams called her and said the voided check she had given the Homeowner's notary on February 3rd had been lost, and so Homeowners needed another one.
Plaintiff testified that on February 8, she called Teresa Simmons at Countrywide, told her she had sent the notice of rescission to Homeowners the night before, and Simmons indicated that she would obtain a pay-off amount from Homeowners. Plaintiff testified that Simmons called her back some time later and told her that Homeowners had said they would not recognize the rescission because the loan had already been funded and because plaintiff had faxed the voided check on the 8th, which was inconsistent with rescission.[1] Simmons testified that she remembered contacting Homeowners at some point, and she remembered that they never got a pay-off amount, and that Wilson's new loan with Countrywide did not go forward.[2] Simmons did not remember the substance of the conversation with Homeowners, and so did not confirm or deny Wilson's version of the communications.
Wilson testified that sometimewhich she thinks was between February 10th and February 14th, although she has previously testified to different datesshe called Homeowners and spoke to some unknown person who said Homeowners had spoken to its attorneys and did not have to accept the rescission. She testified that she had not called Harold Williams earlier because she believed the Countrywide representative had spoken to him. Harold Williams, in contrast, testified that he spoke with plaintiff on February 8, she indicated that she had received the money, and she did not tell him she had rescinded. He testified that he later received a call from a Countrywide person, asking for a pay-off amount. He told that person he knew nothing about a rescission, and then checked with the corporate offices, who told him they had no notice of rescission.
Wilson admits that she took no further action at that time. She allowed the Countrywide loan commitment that she had received on February 7 to expire. Wilson did contact Harold Williams in April or May, and asked him about whether another debt had been paid off from the loan proceeds, as had been contemplated. In this conversation she did not mention that she had rescinded the loan or was seeking any relief. She made seven monthly payments on the Homeowners loan, from March through September of 2001. She then went into default on the loan. Defendant Meritech Mortgage Services, Inc., who had purchased the loan from Homeowners, began non-judicial foreclosure proceedings and a foreclosure date was set for January 31, 2002. Wilson filed this suit on January 28, 2002, and sought an immediate injunction prohibiting the non-judicial foreclosure. I granted that temporary relief, *1216 and defendants have not foreclosed on the home, pending resolution of this case.
Homeowners presented evidence that plaintiff was in financial difficulty when it made the loan to her. She had bounced a check on February 2, and her account was actually overdrawn until Homeowner's had wired the loan proceeds on February 8. Although the application she signed indicated she had monthly income of $8500 (and she provided this same application to Countrywide to obtain its approval for refinancing), she was actually unemployed and had no monthly income. Williams testified that Wilson told him her monthly income was $8500 per month. Plaintiff denied that, and testified that she told Williams that her income varied, because she was self-employed, and that he had filled in this amount, and she simply signed the documents provided by Homeowners on February 3 without reading them. She said there was not enough time to read everything provided by the notary when he showed up at her house, and she assumed the documents were consistent with the discussions she had had with Harold Williams earlier.
Credibility determinations are difficult in this case. Both JoAnne Wilson and Harold Williams appear to be credible people, and there was nothing particular in their testimony or in their manner while testifying that would lead me to disbelieve either of them. Defendants urge that plaintiffs story is inherently incredible, and that she was attempting to "set them up" for a lawsuit, and probably mailed an empty envelope, if anything, on February 7. They question her inability to produce the original certificate of mailing, and suggest that the copy produced may be some kind of fake. They argue that had she faxed the rescission notice (as she had faxed the voided check that same day) it would have been received before the loan was funded, or had she sent it by certified mail there would be proof that she sent it. They point to her desperate need for cash at the time that all this happened, and argue that her actions following February 8 are totally inconsistent with her story that she attempted to rescind.
It is clear that plaintiff was in dire financial straits, and that she needed this money, and some parts of her testimony are inconsistent. But I believe her story about mailing the rescission notice on February 7, and I believe her story about discovering that her wallet was missing and digging around in the bottom of her purse until she found enough change to pay for the postage and the certificate of mailing. I also believe, however, that she knew she had overstated her income on the application form, and that she did so in order to be approved for the loan. She then did this again when she provided Countrywide with the same information.
I also find that Wilson has not shown that Homeowner's actually received the notice of rescission, or that they knew she had attempted to rescind. In other words, I believe most of what both parties said. I am no more inclined to believe that Homeowner's is lying than I am to believe that Wilson is lying. For all I can tell from the evidence, the notice of rescission may have simply been lost in the mail. Plaintiff has the burden of proof in this case, and I do not find that she proved that Homeowners knew that she had attempted to rescind at any time until after she fell into default on her loan and began making these arguments.

Conclusions of Law
Plaintiff brings this action under the Truth in Lending Act and Regulation Z, 15 U.S.C. § 1635 and 12 C.F.R. § 226.23. 15 U.S.C. § 1635 provides, in pertinent part:
(a) ... in the case of any consumer credit transaction ... in which a security *1217 interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction . . .

* * * * * *
(b) When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such rescission.
Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by the court ...
* * * * * *
(f) An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first ...
* * * * * *
(g) In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of. this title for violations of this subchapter not relating to the right to rescind.
Regulation Z provides:
(1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.
(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.
(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under paragraph (d)(2) of this section. When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value ...
Regulation Z, 12 C.F.R. § 226.23(d)(1)-(3).
Plaintiff argues that defendants violated the statute and regulation, and she asks that I void the defendant's security interest in the property as an appropriate remedy. Alternatively, she argues that I should craft some other form of equitable relief that would allow her to keep the house and avoid foreclosure. She acknowledges that she does not currently have the *1218 money to pay back what was lent to her, but urges that some other form of relief is proper.
Although the TILA provides that in the event of a rescission the lender has to perform first (in other words, give back the borrower's money and release the security interest before the borrower has to give back the lender's money), "the Act gives the court discretion to devise other procedures, ... including conditioning rescissions upon the debtor's prior return of the principal." Federal Deposit Insurance Corp. v. Hughes Development Company, Inc., 938 F.2d 889 (8th Cir.1991). Many cases, like Hughes, have conditioned rescission on the borrower's paying back the money. See Williams v. Homestake Mortgage, Co., 968 F.2d 1137 (11th Cir.1992); Rudisell v. Fifth Third Bank, 622 F.2d 243 (6th Cir.1980); Riopta v. Amresco Residential Mortgage Corp., 101 F.Supp.2d 1326 (D.Haw.1999); Reynolds v, D & N Bank, 792 F.Supp. 1035 (E.D.Mich.1992); Rowland v. Magna Millikin Bank, 812 F.Supp. 875 (C.D.Ill.1992). All of these cases involved rescissions made well after a closing because of TILA violations, as opposed to the statutory three-day rescission alleged here.
A failure to recognize a proper rescission, whenever it is made or for whatever proper reason, is a separate TILA violation, of course. See Wright v. Mid-Penn Consumer Discount Co., 133 B.R. 704 (E.D.Pa.1991). I have found that Wilson did do the things she was required to do to properly rescind, but I have also found that Homeowners did not wrongfully refuse to recognize the rescission, because it did not know about it. If things had worked as contemplated by the statute, Homeowners would have, within twenty days of February 7, returned the closing and other fees charged to Wilson, terminated the security interest it had obtained, and Wilson would have returned all the money that she had gotten from Homeowners. Wilson would not have been liable for any finance charges.
None of that happened, of course, because Homeowners did not receive the notice of rescission. Homeowners then funded the loan without knowing that Wilson had attempted to rescind, and Wilson never told them that she had rescinded. Instead, Wilson took the money, made payments on the loan for several months, and never told Homeowners that she believed anything was wrong until she fell into default. While the statute contemplates that rescission can be made within three years if there are TILA violations, here there was no TILA violation.
Moreover, I agree with Homeowners that Wilson's claim would be barred by the common-law doctrines of waiver and estoppel, even had she proven that Homeowners received the notice. Neither party has pointed to any case, and I have not found any, where a court has found waiver, estoppel or laches in a TILA case such as this. The TILA itself is silent regarding whether these concepts should apply. The closest case cited by either party is an unreported decision of the Ohio Court of Appeals, Medlen v. Alternative Lending Mortgage Corp., 1998 WL 546169 (Ohio App. 8 Dist. Aug.27, 1998), appeal dismissed 84 Ohio St.3d 1471, 704 N.E.2d 579 (1999) (table case). In that case the plaintiffs sued their mortgagor under claims of breach of contract, fraudulent misrepresentation, and for "cancellation of an invalid mortgage." After the trial court granted summary judgment to the lender, plaintiffs appealed, and the appellate decision mostly discusses the fraud claim. The opinion appears to discuss waiver in passing:
Appellants additionally argue that summary judgment was inappropriate because a genuine issue of material fact *1219 exists as to whether or not Robert Medley executed and mailed a notice of rescission. However, appellants acted to accept the loan on August 21, 1996, after the alleged cancellation. Accordingly, appellants cannot claim they properly rescinded the mortgage.
1998 WL 546169, at * 3. Although not explicit, this appears to be based on the concept of waiver, since it held that parties who accept the benefits of a contract should not be allowed to claim that they had rescinded that same contract. That is what Wilson is attempting to do here.
As there is nothing in the TILA that precludes applying the equitable principles of estoppel and waiver, I believe it is appropriate to apply it here, because rescission is an equitable remedy. Thus, even had I found that Homeowners had received the rescission notice, Wilson's failure to take any action at all would waive her right to seek rescission later. She spent the money and never advised Homeowners that she had tried to rescind until she defaulted on the loan. Since there were no other TILA violations, it would be inequitable to allow her to wait so many months to assert that she had properly exercised the three-day "no fault" rescission provision.
Accordingly,
IT IS HEREBY ORDERED that plaintiffs complaint is dismissed, and I will enter a separate judgment for defendants in this case.
IT IS FURTHER ORDERED that the preliminary injunction previously issued is VACATED.
IT IS FURTHER ORDERED that all other motions are denied as moot.

ORDER
I have fully considered plaintiffs motion to amend or alter the judgment, and find that she has presented nothing that I have not already fully considered. As her motion provides no basis for relief,
IT IS HEREBY ORDERED that plaintiffs motion to amend or alter the judgment [# 62-1, 62-2] is denied.
NOTES
[1] Defendant objects that this is hearsay, and it is, except to the extent it goes to plaintiff's explanation of her motivation for doing what she did in the following days. I am not considering it for the truth of what, if anything, Homeowners told Simmons.
[2] Simmons testified at the TRO hearing but not at trial, but the parties at trial stipulated that I could consider her testimony there the same as if it had been given at trial.